# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Alfonso Vazquez and<br>Hortencia Vazquez, | Civil No. 04-3006 (DWF/SRN) |
| Plaintiffs, | |
| v. | **MEMORANDUM<br>OPINION AND ORDER** |
| The Gavzy Group, | |
| Defendant. | |

___

Andrea F. Rubenstein, Esq., Hedin Goldberg & Glidden PA, counsel for Plaintiff.

Matthew J. Franken, Esq., and Mark R. Whitmore, Esq., Bassford Remele, counsel for Defendant.

___

## Introduction

The above-entitled matter came before the undersigned United States District Judge on October 14, 2005, pursuant to a Motion for Summary Judgment brought by Defendant The Gavzy Group ("Defendant"). In their Complaint, Plaintiffs Alfonso Vazquez and Hortencia Vazquez assert four counts: (1) employment discrimination under the City of St. Paul Human Rights Ordinance as to both Plaintiffs; (2) employment discrimination under Title VII of the Civil Rights Act, 1991 Civil Rights Act, 42 U.S.C. § 2000e, *et. seq*., as to both Plaintiffs; (3) reprisal in violation of Title VII as to Plaintiff Hortencia Vazquez; and (4) reprisal in

violation of the City of St. Paul Human Rights Ordinance as to Plaintiff Hortencia Vazquez.[1]
For the reasons stated below, Defendant's Motion for Summary Judgment is granted.

## Background

Defendant is a property management group that provides services for a variety of properties in Minneapolis and St. Paul, Minnesota, including Liberty Plaza, an apartment complex in St. Paul. Liberty Plaza was previously owned and managed by the Dayton Avenue Presbyterian Church. Subsequently, the Twin Cities Housing Development Corporation took over as the managing partner, and along with Dayton Avenue Presbyterian Church and outside investors, formed Liberty Plaza Limited Partnership. In 2001, this entity retained Defendant to manage Liberty Plaza.

Upon taking over management of Liberty Plaza, Defendant extended job offers to the prior owner's employees. Both Plaintiffs had worked as maintenance workers at Liberty Plaza for approximately sixteen years prior to Defendant's management of the property. The Vazquezes agreed to continue working for Defendant, even though Defendant was unable to match the salaries that they, and other employees, had previously been paid.

**I.    Alfonso Vazquez**

Upon taking over the management of Liberty Plaza, Defendant hired Alfonso[2] as a maintenance technician. Alfonso's duties included performing routine maintenance of the complex properties. Alfonso's hourly wage decreased from $14.00/hour to $13.00/hour when

---

[1]    Plaintiff Alfonso Vazquez voluntarily agreed to dismiss his claim for workers' compensation reprisal brought pursuant to Minn. Stat. § 176.82 as was originally stated in the Complaint. (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 17.)

[2]    The Court refers to Alfonso and Hortencia Vazquez throughout this Order by their first names. The Court means no disrespect to the Vazquezes but has merely used their first names for the sake of simplicity.

2

Defendant took over. After three months with Defendant, however, Alfonso received a raise that increased his hourly wage to $14.00/hour.

Although Defendant increased Alfonso's hourly wage, Defendant contends that his performance was poor. Kari Barker, a former site manager for the properties managed by Defendant, said that Alfonso was "the slowest and laziest person on The Gavzy Group's maintenance staff" and that he was "a source of frustration on almost every project he was assigned." (Affidavit of Kari Barker ("Barker Aff.") at ¶ 2.) Barker stated that Alfonso's work often required follow-up by another maintenance worker. (*Id.* at ¶¶ 3-4.) Another site manager, Kristina Gromatka, described Aflonso's work as "poor quality" and stated that she experienced numerous problems with his work, including that he spent too much time on projects. (Affidavit of Kristina Gromatka ("Gromatka Aff.") at ¶¶ 3-5.) Gromatka stated that she "complained often" to Defendant about Alfonso's work performance. (*Id.* at ¶ 5.) Jessica Grayson, another site manager, asserted that she would regularly learn that Alfonso had not completed his jobs and that his jobs required follow-up by another worker. (Affidavit of Jessica Grayson ("Grayson Aff.") at ¶¶ 4-5.) Grayson stated that she regularly complained about Alfonso's performance to Alfonso's supervisors. (*Id.* at ¶ 5.)

Sue Hackett was Alfonso's first supervisor with The Gavzy Group. (Affidavit of Sue Hackett ("Hackett Aff.") at 15.) Her first review of Alfonso was generally good.[3] However, Alfonso's subsequent supervisor, Steve Plotz, asserts that almost immediately after he began supervising Alfonso, he found Alfonso's work quality to be poor. (Affidavit of Steve Plotz

---

[3] Hackett asserts that because she was "not an expert in building maintenance issues," her evaluation was based on Alfonso's attendance and his willingness to be dispatched to maintenance jobs. (Hackett Aff. at ¶ 15.) She asserts that she did not become aware of his performance issues until Plotz took over as Alfonso's supervisor. (*Id.*)

("Plotz Aff.") at 6.) Further, Plotz contends that he received a variety of complaints about Alfonso's performance. (Plotz Aff. at ¶¶ 6, 15.) Despite these complaints and Plotz's less-than favorable review, Defendant approved a pay increase for Alfonso to $15.21/hour in January 2001. Plotz completed a Personnel Action Notice on November 28, 2001, warning Alfonso of specific problems with his performance. (*Id.* at ¶ 11.) As a result of this notice, Alfonso was placed on a 30-day probationary period.

Plotz reviewed Alfonso's performance again in January 2002. At that time, Alfonso received low marks for his ability to complete tasks in a timely manner, to use time well, to work as part of a team, to ask questions or for instructions when needed, and for his professional performance. Alfonso did not receive a pay increase after this review. Alfonso stated that he did not receive a raise at this time because Plotz thought that his work was not satisfactory. (Deposition of Alfonso Vazquez ("Alfonso Vazquez Dep.") at 123-24.)

In January 2003, Alfonso had a similar review. At this review, Alfonso received a raise that increased his hourly rate to $15.50/hour. In November 2003, after Alfonso did not receive his discretionary annual bonus, Alfonso contends that he complained to Bill Gavzy, one of the company's owners, that he felt he had been discriminated against. (Affidavit of Alfonso Vazquez ("Alfonso Vazquez Aff.") at ¶ 10.) Alfonso alleges that Bill Gavzy responded that perhaps Plotz was trying to fire Alfonso. (*Id.*) Plotz asserts that any raise that Alfonso did not receive was because Alfonso's performance did not merit a bonus. (Plotz Aff. at ¶ 18.)

Alfonso received another raise in January 2004, that increased his hourly rate to $15.85. According to Defendant, Alfonso's hourly rate was consistent with that of other maintenance technicians with similar training, experience, and licensure. (Affidavit of Angela Emmrich ("Emmrich Aff.") at ¶ 10, Ex. 6.)

4

Ultimately, Alfonso quit his position with Defendant in August 2004. Alfonso asserts that he quit because of the discriminatory, deteriorating working conditions once Plotz took over as his manager. Alfonso contends that once Plotz became his manager, Alfonso's working conditions changed. Alfonso asserts that he began receiving more difficult job assignments that required more of his time. Alfonso also asserts that when Plotz took over, all other maintenance employees of color either were fired or quit working. (Alfonso Vazquez Aff. at ¶ 15.)

Alfonso attributes the criticism about his performance to race and national origin discrimination. (Alfonso Vazquez Dep. at 50, 55-56.) Alfonso also contends that Plotz "papered his file" with complaints and unsigned, negative reviews. Alfonso asserts that this file of negative comments only surfaced in this litigation. (Alfonso Vazquez Aff. at ¶ 4.) Alfonso further contends that he was paid lower wages than white employees who had less seniority and experience.

## II.   Hortencia Vazquez

Hortencia Vazquez was hired by Defendant as a caretaker at $11.00/hour. Hortencia asserts that in addition to completing the cleaning and maintenance duties that she was required to perform under the previous management, Defendant asked her to perform snow removal and to put furniture and mattresses into dumpsters. (Deposition of Hortencia Vazquez ("Hortencia Vazquez Dep.") at 22, 24.)

Defendant asserts that it had difficulties with Hortencia's performance. Defendant contends that Hortencia did not use her time well and often refused to perform or complained about performing certain jobs, such as shoveling or picking up trash. Defendant also asserts that Hortencia was difficult to supervise, and that she expressed a poor attitude toward her supervisors. In addition, Defendant determined that Hortencia was sometimes off-site without

5

permission during work hours, and the site managers had a difficult time finding her when she was needed. (Hackett Aff. At ¶ 7.)

As a result of these issues, Hortencia was placed on a 60-day probationary period beginning March 21, 2003. During this probationary period, Frances Ellis, Hortencia's supervisor, made daily task lists for Hortencia to perform. Hortencia was required to complete tasks in a timely manner and without negative comments, hand out flyers, and check in with the office twice daily. However, Defendant asserts that despite being made aware of the probationary requirements, Hortencia refused to complete the tasks that she was assigned. Hortencia, on the other hand, contends that she was given lists of things to do that were impossible to complete in the time allotted. ( Affidavit of Hortencia Vazquez ("Hortencia Vazquez Aff.") at ¶ 10.)

Hortencia took a vacation in Summer 2003. During the time that Hortencia was gone, Defendant contracted with an outside cleaning service, Smart Cleaning Service Company ("Smart Cleaning"), to perform Hortencia's duties. Defendant asserts that the building was much cleaner while Smart Cleaning was filling in and that Smart Cleaning brought maintenance issues to Defendant's attention, something Hortencia had never done. Moreover, Defendant determined that the cost of retaining Smart Cleaning plus a part-time caretaker was less than the cost to pay Hortencia. Specifically, Hackett evaluated the cost savings and found that Defendant could save $3,427.44 per year by replacing Hortencia with Smart Cleaning. (Hackett Aff. at ¶ 11.) Defendant also determined that such an arrangement would avoid the time involved in supervising Hortencia. (*Id*. at ¶¶ 11-12.) As a result, Defendant decided to terminate Hortencia, effective July 28, 2003, and replace her with Smart Cleaning. Defendant had similarly replaced caretakers at some of its other facilities with contract cleaning services. (*Id.* at ¶ 13.)

6

Hortencia asserts that she was terminated because of race and national origin discrimination. She contends that she was asked to do jobs that were not in her job description and that her workload was significantly more burdensome than that of other non-minority caretakers. (Hortencia Vazquez Aff. at ¶ 6; Hortencia Vazquez Dep. at 39.) In addition, Hortencia asserts that she was the only caretaker who worked without help—that all of the caretakers in other smaller complexes worked in a team of two people. (Hortencia Vazquez Aff. at ¶ 9.)

Hortencia also claims that she was retaliated against for filing a discrimination claim. This assertion rests on two separate incidents that occurred while she was working for Defendant. First, in May 2002, Hortencia contacted the St. Paul Human Rights Department after a supervisor accused her of opening envelopes that contained other employees' bonus checks. (Hortencia Vazquez Aff. at ¶ 7.) Hortencia denied these allegations, but stated that she never brought a formal complaint because the supervisor, Rebecca Thayer, had left the company. (*Id.*) Hortencia also stated in her deposition that she never reported the contact with the Human Rights Department to anyone at The Gavzy Group except Frances Ellis. (Hortencia Vazquez Dep. at 27-28.) Undisputedly, the other managers at The Gavzy Group were unaware that Hortencia had contacted the Department about this incident until this lawsuit commenced. (Hackett Aff. at ¶ 14.) Second, Hortencia filed a charge of discrimination with the St. Paul Department of Human Rights in March 2003, just after she was placed on the 60-day probation. It was approximately four months after she filed this charge that her employment was terminated.

**Discussion**

I.      **Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

II.     **Race and National Origin Discrimination**

The parties agree that the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), should be applied to determine whether Defendant is entitled to summary judgment on Plaintiffs' individual claims of employment discrimination. Under that framework, a plaintiff must establish a *prima facie* case by showing that he or she

8

(1) is a member of a protected class, (2) was qualified for his or her position, and (3) suffered an adverse employment action under circumstances permitting an inference that the action was the result of unlawful discrimination. *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005) (citing *Habib v. NationsBank*, 279 F.3d 563, 566 (8th Cir. 2001)). The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer can satisfy this burden, the plaintiff must show that the employer's reason is a pretext for intentional discrimination. *Id.*

### A.     Alfonso's Claims of Discrimination

Defendant asserts that Alfonso cannot establish a *prima facie* case of race discrimination because he cannot demonstrate that he experienced an adverse employment action. Specifically, Defendant contends that Alfonso did not suffer a "tangible change in working conditions that produces a material employment disadvantage." *Sallis v. University of Minnesota*, 408 F.3d 470, 476 (8th Cir. 2005). Alfonso, on the other hand, asserts that the negative performance reviews were the basis for denying Alfonso's bonuses and declining to give him higher pay raises. Thus, Alfonso asserts that his smaller-than-expected raises and a denied bonus, coupled with the negative reviews, demonstrate an adverse employment action on the part of Defendant.

The Court finds that Alfonso has not established an adverse employment action. First, Alfonso was not terminated from his position; he quit. Aside from the blanket decision to offer lower hourly rates to employees once Defendant took over management of Liberty Plaza, Defendant never altered Alfonso's salary, benefits, or job responsibilities. *Sallis*, 408 F.3d at 476. Alfonso was paid a comparable salary to other maintenance technicians, and was given raises throughout his tenure with Defendant. Moreover, Alfonso's failure to earn a discretionary bonus is not actionable. *See, e.g., Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996)

9

(finding no adverse employment action when an employee did not receive a discretionary bonus).

The remaining considerations upon which Alfonso relies to support his claim of an adverse employment action are unsupported by law. Alfonso's negative reviews are not, in themselves, adverse employment actions. Alfonso was never terminated or demoted as a result of these reviews, nor did he receive a salary reduction in response to the reviews; on the contrary, he received salary increases after all but one review. Defendant's refusal to provide Alfonso training in pool maintenance is not, without more, an adverse employment action. *See Griffith v. City of Des Moines*, 387 F.3d 733, 737 (8th Cir. 2004). Finally, Alfonso's complaints about the work associated with his assignments do not establish adverse employment actions. *See Sallis*, 408 F.3d at 476 (finding that "minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities" do not constitute an adverse employment action).

The Court also does not find persuasive Alfonso's assertions that his negative reviews, lower-than-expected raises, and failure to earn a bonus in one year cumulatively constitute an adverse employment action. First, Alfonso's reliance on *Phillips v. Collings*, 256 F.3d 843 (8th Cir. 2001), in this regard is misplaced. In *Phillips*, a social worker brought a claim of religious discrimination after he told his employer that his religion taught that homosexuality was an "abomination" and that the religion disallowed him from approving homosexuals as foster parents. *Id*. at 846. Phillips had previously received very good reviews from his supervisor, but upon the first review after Phillips revealed his religious beliefs, the same supervisor recommended Phillips' termination and crafted a highly critical 53-page evaluation that was unlike any ever received by Phillips or his co-workers. *Id*. at 849. Here, however, Plotz did not

recommend Phillips' termination.  Moreover, Plotz's comments were consistent with the input that he had received from site managers, and there are no allegations that the tone of Plotz's reviews was unduly harsh or punitive in nature.  Thus, *Phillips* is not persuasive.  Similarly, the Court finds that Alfonso's reliance upon *Kim v. Nash Finch*, 123 F.3d 1046 (8th Cir. 1997), is misplaced.  In that case, the plaintiff suffered a series of punitive actions—including reduced duties, much lower performance evaluations, and requirements that he undergo special remedial training—after he filed a discrimination charge.  *Id*. at 1060.  These facts are not present here.  Even if the Court were to view the negative evaluation, denial of a bonus, job assignments, and minimal wage increases collectively, these actions do not rise to the level of the adverse employment actions described in *Phillips* and *Kim*.  Here, Alfonso has not established that he suffered "a tangible change in working conditions that produces a material employment disadvantage." *Sallis*, 408 F.3d at 476.  As a result, the Court finds that Alfonso has not demonstrated an adverse employment action, and thus that he has not met his burden of establishing a *prima facie* case of discrimination.

Even if Alfonso had established the existence of an adverse employment action, Alfonso has failed to demonstrate that any such action took place under circumstances that give rise to an inference of discrimination.  Alfonso merely has made vague and conclusory allegations that similarly-situated white employees were treated differently with regard to their wages and the conditions of their employment.  However, Alfonso has not set forth any evidence whatsoever to support these claims.  Alfonso has not provided evidence that workers who earned more money, or who were treated to better working conditions, were less skilled.  Nor has Alfonso demonstrated that similarly situated employees received higher raises or bonuses when Alfonso did not.  Plainly, Alfonso has not provided any evidence, direct or circumstantial, leading the

Court to an inference of discrimination. As a result, Alfonso's *prima facie* case fails in this respect.

In addition, even if Alfonso established a *prima facie* case, there is no evidence to support Alfonso's contentions that the reviews, allegedly inadequate raises, or denied bonus were a pretext for discrimination. As noted by the Eighth Circuit, "[a] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1334 (8th Cir. 1996) (citations omitted). Here, Defendant set forth sufficient evidence that Plotz and the site managers believed that Alfonso's performance was poor. Alfonso has set forth no evidence to support that discrimination was "the real reason" behind the manner in which he was paid or evaluated. As a result, Defendant is entitled to summary judgment on Alfonso's claims of discrimination.

### B. Hortencia's Claims of Discrimination

Similarly, Hortencia fails to establish a *prima facie* case of discrimination. Hortencia has not established that her termination occurred under circumstances that give rise to an inference of discrimination. Hortencia has provided no evidence, other than conclusory, speculative allegations, that similarly situated workers were treated differently. Although Hortencia asserts that her workload was more burdensome than that of other caretakers, she offers no evidence to support that her race or national origin played a role in this allegedly heavy workload being assigned. In addition, Defendant undisputedly replaced other complex's caretakers with contract cleaning services, thereby negating any inference of discrimination as to Defendant's replacement of Hortencia with a cleaning service. The evidence before the Court does not support that similarly situated employees were treated differently from Hortencia, nor does the

evidence before the Court make any connection between Hortencia's termination and her race or national origin. As such, the evidence does not support an inference of discrimination and Hortencia's claim for discrimination fails.

Even if Hortencia had established a *prima facie* case of discrimination, Defendant has provided a legitimate, non-discriminatory reason for Hortencia's termination that has not been rebutted by a showing of pretext. After Smart Cleaning filled in for Hortencia during Hortencia's vacation, Defendant recognized that the facility was cleaner and that the management issues related to Hortencia's employment had been eliminated. Defendant completed a cost analysis and determined that the cost of Smart Cleaning plus an additional caretaker was cheaper than paying Hortencia. As a result, Defendant decided to terminate Hortencia. Hortencia has not rebutted this non-discriminatory reason with any evidence of pretext. As such, Hortencia's discrimination claim fails in this regard.

### III.    Retaliation

Hortencia also asserts that Defendant retaliated against her after she brought her complaints of discrimination to the St. Paul Human Rights Department. In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the two actions. *Wallace v. Sparks Health Sys.*, 415 F.3d 853, (8th Cir. 2005) (citation omitted).

Hortencia's claim of retaliation relates to the discrimination charge she brought with the St. Paul Human Rights Department ten days after she was put on a 60-day probation for performance issues.[4]  Hortencia's fails in two respects.

First, the probationary period and its accompanying list of tasks for Hortencia to perform occurred ten days prior to the day that she filed the charge.  Although Hortencia knew that she must perform the tasks or risk her employment being terminated, Hortencia admittedly refused to perform the tasks.  (Hortencia Vazquez Dep. at 57, 59-60.)

Second, the time span between the filing of the charge of discrimination and the termination does not provide the close "temporal proximity" needed to demonstrate the causal link between the adverse employment action and the statutorily protected conduct.  *Wallace*, 415 F.3d at 859.  In order for temporal proximity alone to support an inference of a causal link, the time between the statutorily protected conduct and the adverse employment action must be "very close."  *Id.*  Courts have held that three- to four-month links alone are insufficient to establish this link.  *Id.* (citing cases).  Here, fourteen months elapsed from Hortencia's initial contact with the St. Paul Human Rights Department and her termination; four months elapsed between the actual filing of the discrimination charge and her termination.  Because Hortencia has not demonstrated the causal link between the protected conduct and her termination, her retaliation claim fails.

---

[4]   It is undisputed that aside from Frances Ellis, The Gavzy Group management had no knowledge of the contact Hortencia made with the St. Paul Human Rights Department as to the issue with Rebecca Thayer.  Hortencia has not set forth any evidence to support a claim of retaliation after this first contact was made.  Thus, the Court need not address this issue as part of Hortencia's retaliation claim.

**IV.     Remaining Claims**

Under 28 U.S.C. § 1367(a), a federal court may assert supplemental jurisdiction over state law claims when a federal claim is properly before the court. However, when all federal claims have been dismissed, the court has discretion to dismiss the remaining state claims. 28 U.S.C. § 1367(c)(3); *Willman v. Heartland Hosp. E.*, 34 F.3d 605, 613 (8th Cir. 1994). Section 1367(c)(3) specifically states that the Court "may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction." The Court's discretion as to whether to exercise jurisdiction over these remaining claims should be informed by principles of judicial economy, convenience, fairness, and comity. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

Here, the Court has dismissed Plaintiffs' federal claims, and only Plaintiffs' state law claims brought pursuant to the St. Paul Human Rights Ordinance remain. The Court determines that it will not exercise its supplemental jurisdiction in this instance for the sake of judicial economy. The remaining claims stated in the Complaint are dismissed without prejudice.

For the reasons stated, **IT IS HEREBY ORDERED THAT**:

1.      Defendant's Motion for Summary Judgment (Doc. No. 16) is **GRANTED**.

2.      Counts 2, 3, and 4 of the Complaint are **DISMISSED WITH PREJUDICE.**

3.      Counts 1 and 5 of the Complaint are **DISMISSED WITHOUT PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 16, 2005                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court